Spacelabs, Medical, Inc. Good morning, Your Honors. Good morning, Counsel. May it please the Court, Counsel. My name is Reba Weiss, and I represent the Plaintiff Appellant in this matter, Mr. Freddy Hernandez, who also is present in the courtroom. I would like to reserve three minutes for rebuttal. This Court, of course, engages in a de novo review of a summary judgment motion, and all inferences are to be drawn in favor of the plaintiff as nonmoving party. And it is the Plaintiff Appellant's position that the lower court failed to do that. In fact, it appears that the lower court drew inferences in favor of the moving party, the defendant in this matter, and ignored specific and substantial evidence of discriminatory animus that plaintiff had submitted. In this Court's opinion in Chuang v. UC Davis, the Court held that the plaintiff in an employment discrimination action need produce very little evidence in order to overcome an employer's motion for summary judgment, and that the degree of proof necessary to establish a prima facie case for Title VII is minimal. Because of the fact that direct evidence of intentional discrimination is so hard to come by, the Supreme Court has held in McDonnell-Douglas v. Green that there is a burden-shifting analysis that one engages in. And first, the plaintiff must establish in a disparate treatment claim, the plaintiff must establish a prima facie case. And in order to do so ---- I don't want to keep away for too long from your argument, but I just want to ask you if it can be dealt with fairly quickly. You have two basic arguments. One is the retaliatory discharge, and one is the failure to promote. Correct. It seemed to me from the record that the facts that the company showed about the failure to promote established that all of the failures fell outside of the statute of limitations. Is that wrong? I believe that is wrong, Your Honor. I believe, and I would submit to the Court, that a great number of the failure to promote claims do fall without ---- outside of the statute of limitations. And under National Railroad v. Morgan, we would concede that those were discrete acts that had to be acted upon and, therefore, are not actionable. However, they can be used as background evidence. Yes. Which one? Within the statute. We would assert that the one that's within the statute is the one that involved promotion to a lead position in ---- with Brian Kavanaugh, who was promoted by ---- That's the one where the company record shows he was promoted before, about a week before the three years? Well, I believe that that is a disputed issue of fact. What is the ---- what facts are there on your side to show that the Kavanaugh promotion was within the period? The facts are that Mr. Hernandez himself testified that he believed that he became aware of the promotion at a later period of time. And ---- There was a record that shows, a payroll record that shows the date of the promotion. That may be the date that the company issued the promotion, but the date that Mr. Hernandez became aware that he had been passed over and that a Caucasian male had been chosen over him. So that's the one where you think there is a dispute? I do, yes. Okay. All right. And I think we pretty much see what the dispute is. Okay. Okay. All right. So then let's talk about the retaliatory discharge. Okay. But if I might just take a moment to address that one, unless ---- is that all right? Sure. I would certainly like to say that with respect to that promotion, the lower court did address that promotion and seemed to think that that was within the statutory time limit, at least that's the way I read Judge Rothstein's decision, and found two things in order to reject that on summary judgment. One was that somehow they were not similarly situated, and the second was that the plaintiff had not shown sufficient evidence of pretext. And I believe that we have certainly or shown certainly sufficient for a summary judgment motion, if not, in fact, to establish retaliatory motive. And one was that we start from the basis of a declaration that was submitted by Bobby Silcott, who had been a supervisor with the defendant for a number of years and submitted testimony that was very substantial and very specific of discriminatory animus specifically against Hispanics within this company. Where's her whole testimony in the record? Okay. Her testimony. So did she give a deposition or just an affidavit? It was a declaration. Is that all that she submitted? She's not been deposed? That's correct. That's my understanding. Yes. Can you put your record citation? I could if perhaps after. I'm sorry. I'm sorry, Your Honor. I don't have that. You quoted her quite extensively in your briefs. That's right. I read all that. Okay. But she did submit very specific evidence that she herself had direct dealings with management, interacted with the Human Resources Department, and had direct observation of how management had dealt with issues of national origin, diversity, had failed to promote Hispanics. She herself had advocated on behalf of Hispanic employees that she thought should have been promoted, and Caucasians with lesser experience had been promoted over them. And specifically that discrimination complaints had been submitted to the Human Resources Department, and they were ignored. They were futile. No disciplinary action had ever been taken for hostile work environment claim. And then very specifically as to Kathy Lasher, who becomes very important in the retaliatory discharge, which I'll get to in just a moment, Your Honor. But Kathy Lasher herself treated Hispanic employees as if they were ignorant and low life. So I think we start with the direct evidence of a discriminatory animus within this company. Well, we start with direct evidence from her. Right. That's of a general nature. It's not tied directly to this case, although it might certainly support it. I mean, I understand she's a great witness, it seems, for your side. Yes. But what does she say about, does she say anything about his termination? No, she does not, because she left the company prior to Mr. Hernandez's termination. And how much prior to that? I believe she left the company in 1996, and he was terminated in 2000. Okay. So, I mean, that raises an issue of the strength, the relevance of her supportive statements, because they seem to relate to, like, the earlier periods of time that may be time-barred. That's correct, Your Honor. They are time-barred and not actionable. However, under the Morgan case, they are admissible as background evidence. Okay. And you also have as background evidence, again, the fact that here is a man who had been employed with this company for 22 years, had applied for 10 promotions and had always been denied. Finally, I just want to get to on this failure to promote claim, and I'll move on to the retaliation. The excuse or the reason that was given for promoting Mr. Kavanaugh, who was only three years with the company, three years of experience as a technician, and was more fluent in English. And I did submit, and I hope this Court has had an opportunity to see additional supplementary cases, where this Court has held in Fregante v. City of Honolulu that fluency in English is an inherently suspect reason for an excuse, because it is so inextricably intertwined with national origin, and that the employer must demonstrate a specific factual basis that fluency in English is necessary. And I would submit to the Court that not only did the defendant not establish this factual basis, but even if it had done so, the Court was not in a position on a summary judgment motion to make that type of factual determination. This is precisely the type of factual determination that should be left to a jury, whether or not fluency in English was really necessary to become a lead of a group of technicians, or whether this was a pretext. Okay. And I'll move on to the retaliatory discharge. In order to establish retaliation, a plaintiff must establish a prima facie case, and those are three elements. One is that he engaged in protected activity. The second, that there was an adverse action and some causal connection between the two. This Court has held on numerous occasions that causation can be inferred from timing alone where an adverse employment decision follows on the heels of protected activity. And this Court has held, for example, in Miller v. Fairchild Industries, that 42 days between the protected activity and adverse action was sufficient to infer causation, and in that same case, 59 days. And in Yartsov, this Court held that. It doesn't really depend on – I know it's always nice to have rules, but, you know, it might be – if you were fired three days after. Yes. It might be certainly close enough to suggest it, but if two days afterwards the worker had murdered the foreman, it probably wouldn't get you by summary judgment. I would agree with that, Your Honor. But there wasn't any kind of evidence of that nature. I mean, so it's not really that 42 days alone is always enough. It may be enough. I agree. I would absolutely agree. But it does raise an inference, a suspicion. Oh, yes. Certainly the proximity in time is one of the principal factors that can be used. Right. There's no question about that. Right. And so here we had the adverse – I'm sorry, the protected action on May 2nd, the termination on May 27th, 25 days. Very short period of time. What bothers me is what – how do you get by the fact that the witnesses give sworn testimony that, you know, like they didn't know that he had made the complaint? Right. And that would be not – that's not like an unbelievable kind of procedure. It would be normal procedure, I would think, that an HR manager wouldn't ordinarily or always tell someone who'd initiated a complaint against him. But, I mean, we have sworn testimony both from, I guess it's the HR person saying, I didn't disclose it, and from the other person, is it the person who was involved in the termination decision saying, I'd never heard about it? Right. How can that square sworn testimony be contradicted by inference? Okay. Yes. And I'm glad you raised that, Your Honor, because what the lower court and the defendant seems to gloss over, but is very significant, is that very person in Human Resources to whom plaintiff made the – or engaged in the protected activity made this complaint of sexual harassment of a coworker, that's Ms. Kathy Lasher, was an integral and significant person involved in his termination decision. And that much is conceded by defendants. So in other words, whether or not Mr. Prey, who was the supervisor and the person engaged in the sexual harassment, or Mr. Reeves knew or didn't know, it becomes almost irrelevant, because Kathy Lasher knew. I wouldn't go that far. That's irrelevant. Mr. Prey is the one he complained about. Right. Mr. Prey is the one who decided initially he should be discharged. That's right. And you – right. You have arguments, I gather, that Mr. Prey would have had good reason to think that he was the one who complained about him. That's correct. I wouldn't just say it's irrelevant. You're right. And I retract that statement if I can. It's not irrelevant. But what I would like to refocus the Court on is – and I don't believe it's addressed either by the lower court or by the defendant – is that there were three people involved in this decision to terminate. And that was, one, Mr. Reeves, Mr. Prey, and Kathy Lasher. And Kathy Lasher was the very same Kathy Lasher to whom 25 days earlier – What was her involvement, though? I mean, she's not making the line decision to terminate it. She is – Isn't that Mr. Reeves? Well, I don't believe so. Like Mr. Prey recommends and Reeves decides? Well, I don't believe so, and I'd like to address that question. In their brief, defendant admits that Kathy Lasher was very involved in that decision. In note 13 of their brief, and I quote, defendant states, "...Hernandez is simply wrong in arguing that Prey was the sole force to termination. To the contrary, Reeves sent an e-mail message to Lasher asking her to bring the termination to closure." Asking her what? To bring the termination decision to closure. Right. But that's – I mean, that's – Okay. If I might – That doesn't sound like making – asking her to make a decision given the fact she's an HR person and Reeves is a big boss. Okay. That sounds like she's doing – you know, like people give people paperwork or – Well, once they bring her in, they're bringing in someone who without dispute knows that the plaintiff is the claimant. Exactly. Or I should say the protector. I don't know if that's the right word. Brought to the attention of this harassment of this woman in the workforce. That's exactly right. What's the responsibility of Ms. Lasher in that circumstance? Let's say she's on the ball, so she remembers, number one, that Mr. Hernandez made the complaint. Right. And sees, number two, that Mr. Hernandez is about to get canned. Yes. And she says, you know what? This is a bad idea. Right. Whether he should be canned or not, this is a bad idea because we're headed for litigation if we have this going on. That's right. Is she supposed to say to Mr. Prey, listen, don't fire him because he just made a complaint? No. No. What's he supposed to do? What I would suggest that she's supposed to do is something that was done and was approved of in the Winarto decision that this Court held, which is she's aware of that decision. She says, well, hold on. Let's not rush to termination. Let's conduct an independent investigation as to whether or not – what are the real motives, whether or not Mr. – you know, let me talk to the people in that unit, to the other technicians. Do they think that Mr. Prey is aware that Plaintiff was the rat, so to speak, that had complained about the sexual harassment? Let me – let me or someone else in Human Resources conduct this investigation so that we can sever any retaliatory motive that might appear. And the evidence from which Mr. Prey – the evidence we have that Mr. Prey might have been able to infer that it was Hernandez who reported his sexual harassment. Right. That evidence is simply – is simply this. One is that Mr. Hernandez testified that when he was speaking to the victim of the sexual harassment, Mr. Prey became very anxious and directed him to move away from her, not to speak to her, and, you know, there were coworkers, and continually told him, don't talk to this woman, Sal Sam, who was the victim of the sexual harassment. And is that after the complaint was made? No. That, I believe, was prior and after, both. So – but how – what does that prove?  It doesn't necessarily. I'm not seeing the probative connection to knowledge that he's the complainer. Right. It's – But it shows that he may know of the facts that somebody complained about. And it also may show – It could occur he's one of the possible complainers. That's right. Unlike the general workforce. Right. And it also may show that he was concerned that perhaps Ms. Sam was reporting the sexual harassment to Mr. Hernandez, who then may turn it into Human Resources. But, you know, the other evidence is testimony from two coworkers who say that there was – it sounded like very, you know, prevalent discussion among the coworkers about this sexual harassment and the fact that Mr. Hernandez, he did not keep this a secret, he told coworkers that he had been the one who reported the sexual harassment and reported Mr. Prey to Human Resources, and that it was discussed in the workplace, and that, in turn, it came to Mr. Prey's attention. But if I could – What is the record from Ms. Sam? From Ms. Sam? I don't believe so. Okay. If I could go back just for one moment to Ms. Lasher's involvement in – because I do think this is critical. And she says in her own declaration, which is at the record at page 48, As Human Resources manager, I often participate in the process of terminating employees and did so in plaintiff's case. I discussed the matter with Bill Reeves and Ron Prey and reviewed the proposed termination paperwork. I did not dissuade Reeves and Prey from proceeding with the termination that they were working on. That last statement, I did not dissuade them. The clear implication from that is that she had both the authority and the wherewithal to dissuade them had she chosen to do so. And I think that that fact goes to her own retaliatory motive, taken together with the declaration of Bobby Silcott, who says that she had direct dealings with Kathy Lasher, that Kathy Lasher herself never dealt with a complaint of hostile work environment. What does dissuade mean? I thought it just meant like persuade someone against something. Right. So if she said I didn't dissuade them, it could mean that she – does it mean she urged them not to terminate them and she couldn't convince them? Does it mean she didn't have the authority, they had the authority? I mean, what is your position as to what that means? Our position is that she did not take the – You seem to be arguing if she says I didn't dissuade them, that it means she has the power to control them or manage them. Well, I believe what that – the clear implication, and again, taking all inferences in favor of the plaintiff, is that she could have, but she chose not to. Well, I would say if she said I didn't order them not to do it, then I would say that's like she's saying that she has authority. Yeah. But I'm not understanding that – and I'll study the record, Mark. Okay. Do you think the record giving all inferences to your client supports the idea that she had authority to overrule these two guys? Well, or at least she had the authority to dissuade and, you know, she was involved in the decision to terminate. I mean, if she had the authority to dissuade them, she certainly had some authority. Who had the authority to make the decision? Was there any single person? Well, Mr. Reeves, when asked who had the final say in the termination of Mr. Hernandez, answered the Human Resources Department and Bill DeGroote. That was his response, the Human Resources Department and Bill DeGroote. And Mr. Prey himself testified that any employee relation like this always went through Kathy Lasher. But I think the testimony by Ms. Reeves and – I'm sorry, Mr. Reeves and Ms. Lasher, who had the final say on the termination? Human Resources and Bill DeGroote. Finally, I see that I'm out of time, but I think also that plaintiff in the retaliatory discharge has clearly established pretext, both by direct and indirect evidence. We have the testimony of two coworkers, as well as Mr. Hernandez, that they had been instructed to repair these units that are so much in dispute, precisely the way Mr. Hernandez did do it, and that that was the policy and procedure of the company. We have the testimony of a technician – I'm sorry, testimony that other technicians had made exactly the same error, if it was an error, were never disciplined or terminated. And specifically, the testimony of Alan Flores that Beverly Graham, who was another technician, had made the same mistake, was not terminated. And testimony that other employees had told Mr. Prey that plaintiff was the complainer. So I think we have established clearly a prima facie case as well as pretext, and this matter should be reversed. Thank you. Good morning, Your Honors. Paul Kane for the appellee. You can't retaliate if you don't know, and that's why summary judgment was properly granted here. Mr. Hernandez did make an internal complaint to Ms. Lasher on behalf of a coworker and Ms. Lasher investigated, as she should have, and she took disciplinary action, as she should have. But she never revealed who had made the initial complaint to Human Resources. Was it by her that she never revealed? Yes. It's at 1572 of the excerpts of record. 1572? 1572. It's hard in these cases sometimes to say what you shouldn't, but when we get pages like 1572, it sounds more like record than excerpts. I apologize. Okay. I'm on page 1572. Okay. What is this? Where am I? Oh, I'm sorry. I don't have the confirmation of the page memorized. Well, okay. I can read it myself. What Judge Gould said was right. It's standard operating procedure in investigations like this to share information only on a need-to-know basis. The target of the investigation simply did not need to know here and did not know who had set the investigative wheels in motion. Now, shielding the accused from this information protects the accused, protects the accuser, and it protects the company as well. It's classic Human Resources best practices. It protects the accuser because it guards against base human instincts of retaliation, and it protects the accused because he or she is recused from access to information that could be misused, and therefore, it also protects him or her against false charges. And then, of course, it protects the company because the company is allowed to avoid any factual dispute about what the motivation for a decision later might have been. How big is the work unit here in question? What I'm driving at is the following. It appears that one of Mr. Hernandez's arguments, maybe one of his stronger arguments, is that it wasn't going to be too tough for Mr. Prey to figure out that he was the likely complainant, the sexual harassment. So how many people are under the supervision of Mr. Prey? How many people are involved in the unit with Mr. Hernandez and Ms. Sam? In other words, how many likely suspects are there? Can you give me some sense of that? I can't. I don't think the record shows exactly how many people are in the work unit, but I can respond to the question this way. Okay. Who would be the likely suspects? Ms. Sam and Mr. Flores, who had a confrontation with Mr. Prey telling him to stay away from Ms. Sam. And that's a point that perhaps we didn't make clearly enough in the brief, so let me call that citation to your attention. It's 1511A, 1511A of the excerpts of record. This may be an example of the dog that didn't bark. What happened to Ms. Sam, perhaps the ultimate most likely suspect? Nothing. She was not disciplined. She was not discharged. What happened to Mr. Flores, who had this confrontation with Mr. Prey? Nothing. He was not disciplined. He was not discharged. And neither of them reported. The one who was discharged was the one who reported. And Mr. Prey did not know that. Well, that we don't know. I mean, the fact that the ones who didn't report him weren't discharged doesn't prove very much. But it shows that if they didn't just do it out of speculation, that either somebody told them about Mr. Hernandez or not. But they didn't just go around looking for suspects. He was certainly one of the suspect class. Well, there's absolutely no reason to believe he was part of the suspect class, because he did not witness the incident firsthand. He heard about the underlying incident only indirectly. There was no more reason to. But he is somebody who had had discussions with Mr. Prey in the past about Mr. Prey's harassment of Ms. Sam. Nothing. I disagree. Well, that's what they say. He says that he told him to stay away from her, that he came up while she was talking. I thought that was Flores or some other person. It was Flores. Flores approached Mr. Prey and said, stay away from her. And that's the citation I gave to Judge Fletcher of 1511A. But there is something. I don't want to make sure we get it right. This is such a big record, it's hard to keep our hands around it. But I gather there's a point at which Mr. Prey says to Mr. Hernandez, you stay away from Ms. Sam. Yeah, that's what I was talking about.
judges: Reinhardt, W Fletcher, Gould